UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| M.R., a minor, by and through his parents D.R. and M.R., | Case No.: 19-cv-00918 |
| Plaintiff, | |
| vs. | |
| NORTHSHORE SCHOOL DISTRICT, | CORRECTED COMPLAINT FOR JUDICIAL REVIEW AND RECOVERY OF ATTORNEY FEES |
| Defendant | |

M.R. ("M.R." or "Student") is a now 10-year-old boy with specific learning disabilities, generalized anxiety disorder, attention deficit hyperactive disorder and language impairments including impaired articulation and selective mutism, all disabilities that impact his education to the point specially designed instruction is needed. M.R. also has an unknown allergy that produces an anaphylactic response and requires access to an Epi-pen at all time. Federal and state law requires the Northshore School District ("Northshore" or "District") to provide a Free Appropriate Public Education (FAPE) to M.R. through the development of an Individual Education Plan ("IEP") reasonably calculated to remediate, and if appropriate, accommodate these disabilities that is appropriately ambitious in light of his circumstances and potential.

**Cedar Law PLLC**
1001 Fourth Avenue #4400
Seattle, WA 98154
angela@cedarlawpllc.com
Tel 206.607.8277 • Fax 206.237.9101

During the course of his first, second and third grade years Northshore failed to provide M.R. with a FAPE. M.R. made virtually no progress over the course of first grade. In second grade he could not read a sentence of any level, and could not complete kindergarten-level written expression assessment tasks. He continued to make de minimus progress as he entered third grade. During his tenure in Northshore, the District failed to provide an adequate and appropriate Behavior Intervention Plan ("BIP"). Contrary to state law, the District repeatedly isolated and restrained M.R. as a disciplinary measure including, at one point, restraining M.R. in a floor hold until he passed out. As a result of the District's failure to provide M.R. with a FAPE, the Parents used their retirement savings to fund private services that met M.R.'s needs.

The parents requested an administrative hearing under the Individuals with Disabilities Education Act ("IDEA") to challenge the District's failure to provide an appropriate program for M.R. and sought funding for the private services. After a 6-day due process hearing held on August 6, 7, 8, 9, 10, and 15, 2018, administrate law judge Anne Senter issued a decision on March 22, 2019 concluding that the Northshore School District denied M.R. a FAPE between November 8, 2016 and December 11, 2017 but otherwise provided M.R. with a FAPE. The ALJ ordered remedies for the denial of FAPE but denied the parents' request for reimbursement based on the misapplication of fundamental requirements under the IDEA. The remedies the ALJ ordered in place of reimbursement are inappropriate, vague, arbitrary and capricious, and incorrectly calculated. The parents hereby appeal the remedies. The ALJ also erroneously found that the District did not deny M.R. a FAPE from December 11, 2017 to the present; a conclusion the parents also appeal.

The hearing decision contains substantial errors of law and fact and fails to make other material findings of fact and conclusions of law. The legal errors are fundamental and include the failure to apply or the misapplication of fundamental requirements of the IDEA. Pursuant to 20 U.S.C. § 1415(i)(2)(A), 34 C.F.R. § 300.516, and WAC 392-172A-05115, the Plaintiffs partially appeal the decision of the administrative law judge. Parents specifically appeal the remedies ordered by the administrative law

**Cedar Law PLLC**
1001 Fourth Avenue #4400
Seattle, WA 98154
angela@cedarlawpllc.com
Tel 206.607.8277 • Fax 206.237.9101

judge for the denial of FAPE between November 8, 2016 and December 11, 2017 together with her decision that the District provided M.R. with a FAPE from December 11, 2017 to the present.

Under the IDEA, a complaint may be brought in a district court of the United States without regard to the amount in controversy. The state provides the court with the records of the administrative proceedings and the court hears additional evidence at the request of a party. 20 U.S.C. § 1415(i)(2)(C)(I) & (II), 34 C.F.R. §300.516(c)(1) & (2), and WAC 392-172A-05115(3)(a) & (b).   Additionally, as prevailing parties in the underlying due process hearing, the Parents are entitled to, and request, an award of reasonable attorney fees under 20 U.S.C. §1415(i)(3)(B).

## I.    PARTIES

1.1    M.R. ("M.R" or "Student), age ten resides with his parents, D.R. ("Father") and M.R. ("Mother") (Collectively referred to herein as "Parents") within the Northshore School District's boundaries in Northshore, Washington, where they have resided at all times relevant to this action with Student M.R.

1.2    Defendant, NORTHSHORE SCHOOL DISTRICT, is a Washington state Municipal Corporation located in Northshore, Washington.

## II.    JURISDICTION

2.1    Plaintiff's claims arise under the Individuals with Disabilities Education Act ("IDEA") 20 U.S.C. §1400 et. seq.; 28 U.S.C. §§ 2201 and 2202; and the state Education for All Act ("State Act") Chapter 28A.13 RCW; and the regulations promulgated thereunder.

2.2    This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1342; 20 U.S.C § 1415(i)(2)(A); and, as to the state claims, pursuant to pendent jurisdiction.

2.3    This Court has jurisdiction over attorney fees pursuant to U.S.C. § 1415(i)(3).

## III.    ALLEGATIONS

3.1    The IDEA and its implementing regulations, 34 C.F.R. Part 300, and the State Act and its implementing regulations, Washington Administrative Code Chapter 392-172A, entitle all students

**Cedar Law PLLC**
1001 Fourth Avenue #4400
Seattle, WA 98154
angela@cedarlawpllc.com
Tel 206.607.8277 • Fax 206.237.9101

between the age of three and 21 with disabilities access to a free appropriate public education.

3.2    The District has received and is receiving federal and state funds under the IDEA and the State Act. These federal funds are received by the District for the purpose of providing each disabled child within its boundaries with a free appropriate public education.

3.3    At all relevant times, M.R. qualified for services under the IDEA through the Northshore School District.

### A. M.R.'s Disability Related Needs entitle him to a Free, Appropriate, Public, Education through the Northshore School District

3.4    Overall, M.R. demonstrates significant delays in his written expression, reading, and mathematics achievement compared to other children his age despite intellectual functioning that is as developed as his same aged peers.

3.5    Additionally, M.R. has anxiety that affects his socialization and communication, as well as his academic functioning. He also has a history of challenges with overactivity, self-management, and attentional problems due to attention deficit hyperactive disorder.

3.6    Social anxiety plays a role in M.R.'s ability to express him self verbally, his willingness to engage socially, and his opportunities to forge relationships and make friends. He has also had considerable difficulty participating or persisting in activities, particularly academic activities, in which he perceives he may fail.

3.7    Overall, M.R. reports a general level of anxiety that is much higher than is typical for someone his age. His anxiety is characterized by social and performance worries as well as physical symptoms.

3.8    M.R. meets criteria for Selective Mutism, given his history of and continued demonstration of speech refusal in certain situations and its interference with his social and educational functioning. His refusal to speak represents a strategy to manage intense anxiety arousal, particularly his concerns with social interaction and performance failure.

**Cedar Law PLLC**
1001 Fourth Avenue #4400
Seattle, WA 98154
angela@cedarlawpllc.com
Tel 206.607.8277 • Fax 206.237.9101

3.9    Although his symptoms have mitigated dramatically since leaving the Northshore School District, past symptoms included concentration problems, withdrawal, speech refusal, and acting out with escalating anxiety expressed as more disruptive externalizing behavior and thoughts of self-harm.

3.10    Based on a District evaluation completed in 2013, M.R. qualified for IDEA services under the "developmental delay" eligibility category and received specially designed instruction in "behavior" and "social-emotional skills."

3.11    Due to symptoms of his anxiety and ADHD, the District placed M.R. in a "mid-level social/emotional program" that serves students with clinically significant social, emotional, and behavioral needs.

**B.    Northshore School District's October 2016 Evaluation was not appropriate and denied M.R. a Free Appropriate Public Education**

3.12    In October 2016 of M.R.'s second grade year, the District completed M.R.'s triennial evaluation ("Second Grade Evaluation").

3.13    The team determined that the Second Grade Evaluation would include a review of existing data, a general education teacher report, assessment of M.R.'s communication needs, medical-physical needs, social-emotional and behavioral needs, academic needs, and a student observation. M.R.'s mother requested cognitive testing but this was denied.

3.14    At the time of the Second Grade evaluation, the District knew or should have known that specific learning disabilities were an area of suspected disability.

3.15    M.R. had made de minimus progress in reading, writing and math over the course of first through second grade.

3.16    Data collected on M.R.'s academic achievement revealed exceptionally significant below average scores in all academic areas. Student scored in the 3rd percentile in reading, the 0.1 percentile in writing, and the 4th percentile in math.

3.17    M.R. did not achieve adequately for his age or meet grade-level standards in several of

**Cedar Law PLLC**
1001 Fourth Avenue #4400
Seattle, WA 98154
angela@cedarlawpllc.com
Tel 206.607.8277 • Fax 206.237.9101

the areas set forth in WAC 392-1724-03055(1) including written expression, basic reading skills, reading fluency skills, and reading comprehension.

3.18    M.R., a second grader, could not read a sentence at any level, and could not complete kindergarten-level written-expression assessment tasks.

3.19    Cognitive assessment is critical in determining the presence of a specific learning disability where a severe discrepancy model, such as that used by the District, is used to determine the presence of specific learning disabilities.

3.20    In addition to academic difficulties, M.R. exhibited trouble with expressive language at the time of the Second Grade Evaluation.

3.21    M.R.'s second grade teacher reported that he "often has confused or disorganized speech."

3.22    M.R.'s mother and teacher both expressed concerns with M.R.'s "ability to express ideas and communicate in a way others can easily understand."

3.23    M.R.'s score on the BASC-3, a standardized behavior scale, scored M.R.'s functional communication ability as clinically significant, a range in which the District admitted indicated a need for further assessment.

3.24    The District, however, failed to assess M.R.'s functional communication during the November 2016 evaluation.

3.25    The ALJ held that the BASC-3 and a prior IEP put the district on notice of potential language issues.

3.26    However, she concluded, in error, that the lack of language testing did not deny M.R. a FAPE due to her erroneous finding that Dr. Edstrom did not later recommend additional language testing or services beyond articulation and her erroneous application of law.

3.27    However, Dr. Edstrom administered several language tests not administered by the District and found that M.R.'s oral expression was below expected levels with difficulties in oral word fluency and sentence repetitions.  She noted that he was nervous about speaking in a large group and

**Cedar Law PLLC**
1001 Fourth Avenue #4400
Seattle, WA 98154
angela@cedarlawpllc.com
Tel 206.607.8277 • Fax 206.237.9101

worries that someone might call on him.

3.28    Dr. Edstrom found that M.R.'s level of anxiety and capacity for oral expression varied considerably across sessions with her and diagnosed him with selective mutism.

3.29    Dr. Edstrom recommended several additional services for M.R. relative to his language impairments including providing him time and support for learning activities that require rapid language production, such as in classroom discussions.

3.30    She recommended in vivo support for initiating and engaging in appropriate peer interactions and using social and communication skills with others during both structured and unstructured activities.

3.31    She recommended ongoing support for developing functional communication skills, such a participating verbally or non-verbally in class activities, asking for help or the resources that he needs, communicating in social interactions and expressing his thoughts and feelings effectively.

3.32    Dr. Edstrom recommended specially designed instruction in social and social communication skills such as participating in classroom activities, initiating and maintaining positive social interaction and relating appropriately to peers.

3.33    She further recommended specially designed instruction in communication skills to improve age-appropriate articulation and increase expressive communication at school.

3.34    She specifically testified that support from a speech language pathologist would be helpful for M.R, particularly where the speech-language pathologist had exposure, training and knowledge of selective mutism.

3.35    The lack of language testing precluded the parents and IEP team from assessing information about M.R.'s language functioning.  This impacted the ability of M.R.'s IEP team to fully understand M.R.'s circumstances and needs, and denied M.R.'s parents the information necessary to fully participate in the IEP creation process.

3.36    Although agreed to by the team, the District failed to gather a general education teacher

**Cedar Law PLLC**
1001 Fourth Avenue #4400
Seattle, WA 98154
angela@cedarlawpllc.com
Tel 206.607.8277 • Fax 206.237.9101

report as part of the Second Grade Evaluation.

3.37    The ALJ correctly held that failure to include a general education teacher report in the evaluation was a procedural violation but incorrectly held the violation did not deny the Student a FAPE using the wrong standard.  The ALJ reasoned that because M.R. "spent the bulk of his school day in the special education setting" the lack of general education report could not deny M.R. a FAPE.

3.38    The fact that M.R. spent the bulk of his school day in the special education setting, however, is irrelevant, as M.R.'s IEP required him to spend approximately 20% of his time in the general education setting including during times he was to receive specially designed instruction during specialist classes including library, music, and during lunch recess and P.E., significant social periods of M.R.'s day.

3.39    Information from a general education is important in order to get information about the child's response to instruction, his social and emotional functioning in a general education setting, and to provide information necessary to evaluate how M.R. was doing under the current program and what adjustments might have been needed to meet his needs.  It is also important for parent participation that they are provided with this information, especially when the team agreed that a general education teacher report was part of a comprehensive evaluation.

3.40    The impact the lack of this report had on M.R.'s program can only be speculated.  Contrary to the ALJ's ruling, the failure of the District to provide a general education teacher report during the Second Grade Evaluation denied M.R. a FAPE because it significantly interfered with parental participation.

**C.  The District Denied M.R. FAPE Through-Out Second Grade and He is Entitled to Appropriate Remedies**

3.41    The ALJ correctly held that the District denied M.R. for the duration of his Second Grade IEP, an IEP that spanned from November 8, 2016 to December 11, 2017 due to a deficient IEP in the areas of reading, writing, social-emotional and behavior.

3.42    The Second Grade IEP was in effect for more than a full school year, however the ALJ

**Cedar Law PLLC**
1001 Fourth Avenue #4400
Seattle, WA 98154
angela@cedarlawpllc.com
Tel 206.607.8277 • Fax 206.237.9101

based her award on the span of a single school year.

3.43    The ALJ found that because "[s]tudents are generally able to progress much more rapidly when tutored one-to-one rather than receiving instruction in classrooms with other students" an "hour-for-hour award" was not appropriate.  She did not support this assertion with any record evidence nor did she explain how students progress would be affected by one-to-one instruction this applied to M.R.'s circumstances.

3.44    Based on records it shows that at the time of the implementation of his Second Grade IEP he was already receiving 1:1 instruction for a large portion of his day including 42% of the time that the District BCBA observed him.

3.45    The ALJ arbitrarily decreased the amount of reading and writing instruction awarded to student by 50% for the unsupported and conclusory reason that students in general progress faster when provided 1:1 instruction without explanation or evidence as to why or how this reduction was appropriate in M.R.'s circumstances.

3.46    The ALJ arbitrarily decreased the combined social-emotional and behavioral Specially Designed awarded to student by close to 80% for the unsupported and conclusory reason that students in general progress faster when provided 1:1 instruction without explanation or evidence as to why or how this reduction was appropriate in M.R.'s circumstances.

3.47    The ALJ erred in failing to order reimbursement for private expenses the parents incurred as a result of the District's failure to provide M.R. with a FAPE.  The Parents gave notice of their intent to seek private services, the ALJ found that the District Denied M.R. a FAPE, and the services obtained were appropriate.

3.48    M.R. continues to be enrolled part-time at Dolan Academy, a private school certified by the state for the purpose of providing special education, where he continues to make substantial progress and is approaching grade level in reading, writing, and mathematic skills and has made substantial social, emotional and behavioral progress.

**Cedar Law PLLC**
1001 Fourth Avenue #4400
Seattle, WA 98154
angela@cedarlawpllc.com
Tel 206.607.8277 • Fax 206.237.9101

3.49    Although the ALJ specified the amount of compensatory hours and broad categories of services, the ALJ erred in ordering vague relief without setting forth a comprehensive compensatory program.

3.50    Because the relief ordered is vague, the details of the compensatory program are necessarily delegated to the discretion of the IEP team including how student will be transported to services, and how necessary related services will be provided, what goals the student will work on, what the student's baseline is and all the issues that brought the parties before the court today.

3.51    Such an approach could trap M.R. in a cycle of costly and time-consuming litigation.

3.52    The ALJ erred in delegating the design of a compensatory program to the IEP team.

3.53    Allowing the school district that failed or refused to provide the covered student with a FAPE to determine the remedy for that violation is at odds with the review scheme set out at 1415(i)(2)(C) nor can the ALJ place the burden of designing a compensatory education on the parent.

3.54    It would be appropriate for the ALJ to order independent educational evaluation with the purpose of to provide the information necessary to craft an appropriate and comprehensive compensatory education program for M.R.

### D.  M.R.'s Third Grade IEP was Inappropriate Given M.R.'s Circumstances and Potential and Denied M.R. a Free Appropriate Public Education

3.55    Over the parents' objections, a new IEP was finalized and set to be implemented on December 11, 2017 ("Third Grade IEP").

3.56    Several of the goals in the Third Grade IEP are measured solely by "data" and "teacher observation," however what "data" is to be used is not defined and "teacher observations" are not objective.

3.57    Due to the team not having accurate baseline data the IEP team, instead of creating goals with supporting data or gathering baseline data, the IEP team listed the baseline of several of M.R.'s Third Grade Goals inaccurately as M.R. completely lacking the skill being measured.

**Cedar Law PLLC**
1001 Fourth Avenue #4400
Seattle, WA 98154
angela@cedarlawpllc.com
Tel 206.607.8277 • Fax 206.237.9101

3.58    M.R.'s Third Grade IEP failed to devote sufficient time to his academic needs and failed to provide specific, measurable annual IEP goals.

3.59    The ALJ erroneously concluded that the Third Grade IEP provided a FAPE without making any findings of fact or providing any explanation for her conclusions of law other than the Parents closing brief failed to address certain issues.  However, closing briefs are optional and regardless, the parents closing brief did address the appropriateness of the Third Grade IEP.

3.60    Although the ALJ determined that M.R. could accomplish 100% more academically if provided with 1:1 instruction she did not find that the lack of 1:1 instruction coupled with a program that provided for exceptionally minimal academic progress was inappropriate for M.R. needs given his circumstances and potential.

3.61    Although the ALJ found that M.R. could accomplish over 200% more progress in his social, emotional and behavioral goals if provided with 1:1 instruction she did not find the lack of 1:1 instruction coupled with a program that provided for exceptionally minimal social, emotional and behavior progress was inappropriate for needs given his circumstances and potential.

**E.  M.R.'s Third Grade Reading Program was Woefully Inappropriate Given**

**M.R.'s Circumstances and Potential**

3.62    Over the course of an entire school year the only reading materials the District expected M.R. to master were:

     a.    When given a text at his instructional level, M.R. will read accurately improving basic reading (fluency) from 97% accuracy in a middle of first grade level text (Fountas and Pinnel level G) to 97% accuracy in a middle of second grade level text (Fountas and Pinnel level M) as measured by IRR test, informal reading, and staff collected data.

     b.    When given a text at his instructional level, M.R. will answer text-based comprehension questions improving reading comprehension from 57% accuracy

**Cedar Law PLLC**
1001 Fourth Avenue #4400
Seattle, WA 98154
angela@cedarlawpllc.com
Tel 206.607.8277 • Fax 206.237.9101

at a middle of first grade level text (Fountas and Pinnell level G) to 57% accuracy at a middle of second grade level text (Fountas and Pinnell level M) as measured by IRR scores, classroom based measures, and teacher observations.

c.  When given a list of 50 third grade words containing a mixture of phonemes, M.R. will decode the words improving basic reading skills from 0% accuracy to 80% accuracy as measured by classroom collected data, curriculum base measures, and teacher observations.

3.63    Student's third grade IEP calls for 100 minutes per week working on these goals. As the remainder of student's time in school is dedicated to different goals, this time represents the total time dedicated to reading for M.R.'s program.

3.64    100 minutes of reading instruction weekly is not appropriate for any third grade student, much less a student such as M.R. with significant reading deficits despite average intellectual potential.

3.65    Dr. Edstrom testified that 90 minutes daily of direct instruction is necessary for a child with M.R.'s profile. The District's own expert testified that a child such as M.R. needs two 50-minute sessions of direct reading instruction daily (100 ~~hours~~ minutes per day) in order to progress.

3.66    The Third Grade reading goals are not appropriately ambitious in light of M.R.'s circumstances and potential. For instance, 57% accuracy is only slightly better than chance. Additionally, under this program over the course of a full school year M.R. will only master 40 grade-level reading words.

3.67    The decoding goal additionally fails to provide M.R.'s baseline. Although the goal is for M.R. to be able to read 40 third grade words by mid-fourth grade, the baseline fails to establish what M.R. is currently capable of reading. Because there is no meaningful baseline, it is impossible to determine if this goal is appropriate for M.R.

**F.  The Reading Program offered by the District in M.R.'s Third Grade IEP was Inappropriate and Denied M.R. a Free, Appropriate, Public Education**

**Cedar Law PLLC**
1001 Fourth Avenue #4400
Seattle, WA 98154
angela@cedarlawpllc.com
Tel 206.607.8277 • Fax 206.237.9101

3.68    For the entirety of his third grade year, the sole math skills that M.R. was expected to master were:

    a.    When given mixed addition and subtraction problems involving regrouping within 100, M.R. will solve the problems improving math calculations from 50% accuracy to 80% accuracy as measured by student work samples, curriculum based measures, and staff collected data.

    b.    When given a word problem with basic addition and subtraction within 20, M.R. will accurately identify the operation and solve the problem improving problem solving skills from 0% accuracy to 50% accuracy as measured by classroom activities, teacher observations, and curriculum based measures.

3.69    The Third Grade Math goals are vague, ambiguous, and immeasurable.

3.70    The Third grade Math goals do not address M.R.'s understanding of quantitative concepts, or his ability to carry out math algorithms correctly.

3.71    A 50% accuracy rate in basic addition and subtraction is not sufficiently ambitious for M.R. given his circumstances and potential and represents accuracy that is attainable by chance.

3.72    The Third Grade Math goals have inaccurate baselines, and are not appropriately ambitious given M.R.'s circumstances and potential.

3.73    80 minutes per week of mathematics instruction over the course of a school week is insufficient for any child, much more so a child with M.R.'s profile.

3.74    M.R. needs at least 60 minutes of specialized mathematics instruction daily, whereas the Third grade IEP only calls for 100 minutes weekly.

### G.  The Writing Program offered by the District for M.R.'s Third Grade IEP was Inappropriate and Denied M.R. a Free, Appropriate, Public Education

3.75    Over the course of an entire academic year, the only writing skills the District expected M.R. to master were:

**Cedar Law PLLC**
1001 Fourth Avenue #4400
Seattle, WA 98154
angela@cedarlawpllc.com
Tel 206.607.8277 • Fax 206.237.9101

a.      When given a writing topic, M.R. will write complete sentences (minimum 5 words) improving writing production from 0 complete sentences in a 30 minute period to 3 complete sentences in a 30 minute period as measured by classroom assignment and data collection.

b.      When given a writing prompt, M.R. will use accurate conventions (punctuation and capitalization) improving convention skills from 72% of the time to 90% of the time as measured by classroom based measures, student work samples, and teacher observations.

3.76      M.R.'s IEP team failed to include a spelling goal in M.R.'s Third Grade IEP for the conclusory reason that "spelling is not a need right now but might be in future."

3.77      At the time M.R.'s Third Grade IEP was designed his academic achievement in spelling was severely delayed and in the 0.4% when compared to his typically developing peers.

3.78      The Third Grade IEP fails to have any goals dedicated to M.R.'s severe deficiency in spelling making the IEP inappropriate for M.R.'s needs.

## H.   The Social-Emotional and Behavioral Program offered by the District for M.R.'s Third Grade IEP was Inappropriate and Denied M.R. a Free, Appropriate, Public Education

3.79      M.R.'s Third grade IEP had 3 social-emotional and behavioral goals to be mastered by mid-fourth grade:

a.      When given a stressful situation (challenging work tasks, non-preferred people, or activities), M.R. will select a coping strategy (a break, help, compromise, breathing or visualizing) improving self-regulation skills from 0% of the time to 80% of the time as measured by classroom data collection and teacher observation.

b.      When given a visual self-rating system

**Cedar Law PLLC**
1001 Fourth Avenue #4400
Seattle, WA 98154
angela@cedarlawpllc.com
Tel 206.607.8277 • Fax 206.237.9101

(feelings thermometer, 5 point scale), M.R. will accurately identify his feelings improving emotional awareness from 0% accuracy as measure by teacher observation and classroom collected data.

c.    When given a task M.R. will begin the task within 1 minute and remain on task for a minimum of 25 minutes with no more than 2 adult prompts improving responsibility skills from 0 out of 10 consecutive occasions to 8 out of 10 consecutive occasions as measured by teacher observations and staff collected data.

3.80    The Third Grade Social-emotional goals are arbitrary and not designed with M.R.'s needs and abilities in mind.

3.81    Documentation from October 2016 indicates M.R. was able to ask for help, break or compromise independently 30% of the time yet the related goal in his Third Grade IEP indicates that M.R. does not have this skill and is completely unable to ask for help, a break or a compromise despite allegedly working on these goals as part of his BIPs since the first grade.

3.82    Information taken during the November 2016 FBA indicated that M.R.'s task delays were never more than 1-2 minutes, indicating that on occasion M.R. was able to begin a task in 1 minute, however, the baseline for M.R.'s task initiation goal is arbitrarily set to 0.

**I.    The Behavioral Intervention Plans offered by the District were Inappropriate and Denied M.R. a Free, Appropriate, Public Education**

3.83    At all relevant times, M.R.'s IEP team had determined that a Behavioral Intervention Plan ("BIP") was necessary in order for M.R. to receive a FAPE.

3.84    In Third Grade M.R.'s BIP had a Emergency Response Plan that allowed District staff to isolate and restrain M.R. in the event his behavior posed an imminent likelihood of serious harm.

3.85    Several times the District restrained or isolated M.R. past the point that he posed a likelihood of serious harm.   The District had a policy, contrary to state law and not in M.R.'s BIP, to

**Cedar Law PLLC**
1001 Fourth Avenue #4400
Seattle, WA 98154
angela@cedarlawpllc.com
Tel 206.607.8277 • Fax 206.237.9101

keep him in isolation and restraint for one to five minutes after the point he presented as calm.

3.86    On one occasion, the District restrained M.R. in a floor hold until he passed out.

3.87    The last BIP developed for M.R. was first in effect on October 10, 2017 ("Third Grade BIP").

3.88    The Third Grade BIP does not address many of the behaviors that resulted in the District isolating or restraining the student such as "hitting, kicking, spitting or leaving the room."

3.89    The Third Grade BIP fails to match positive intervention strategies to specific behaviors and instead simply lists several dozen behaviors and a single vague blanket intervention strategy.

3.90    The Third Grade BIP has several vague undefined terms such as "cool-down" "restart," "solution room," and "time-away."

3.91    The District employed several procedures outside of M.R.'s BIP such as "retribution," and "Think sheets" in responding to his behavior.

3.92    The Third Grade BIP is overly vague and not written in a manner necessary to ensure consistent implantation of the plan. For instance, the BIP states that M.R. must complete" a series of steps in order to reenter the class structure and begin earning classroom based rewards after isolation, restraint or a time-away" but fails to delineate what these steps are.

3.93    The District required M.R. to sit calmly for five consecutive minutes before it would release him from certain isolations although this was not in M.R.'s BIP and is a violation of State law.

3.94    The District isolated and restrained M.R. for such actions as: "talking loudly," "using his materials as toys," "tipping in chair," and "erasing teacher's math board" with the purposes of managing his behavior and not to prevent the imminent likelihood of serious harm.

3.95    Either the BIPs are inappropriate because they allow for the illegal isolation and restraint of M.R., or the District failed to implement the agreed upon BIP by providing illegal interventions.

**J.    The District Denied M.R. a Free, Appropriate, Public, Education by failing to provide M.R. with home-hospital instruction**

**Cedar Law PLLC**
1001 Fourth Avenue #4400
Seattle, WA 98154
angela@cedarlawpllc.com
Tel 206.607.8277 • Fax 206.237.9101

3.96    The law requires that "Home or hospital instruction **shall be** provided to students eligible for special education… who are unable to attend school for an estimated period of four weeks or more because of illness or injury." WAC 392-172A-02100 (emphasis added).

3.97    "As a condition to such services, the parent of a student shall request the services and provide a written statement to the school district from a qualified medical practitioner that states the student will not he able to attend school for an estimated period of at least four weeks." Id.

3.98    On or about January 30, 2018, the Parents submitted a letter from Dr. Belarmino, a qualified medical practitioner, to the District requesting home/hospital services for M.R. as of January 18, 2018 for a minimum of four weeks.

3.99    The District never sent prior written notice proposing to hold an IEP team meeting to address the Parents request for home/hospital for M.R. and never scheduled or requested an IEP team meeting for the purpose of determining home-hospital services for M.R.  The district never issued prior written notice indicating the Parents refused to participate in an IEP team meeting following their fully executed request for home-hospital services.

3.100   Although Parents agreed that an IEP team meeting was not necessary, the parents did not waive the right to an appropriate program for their son or any of their rights under the IDEA.

3.101   The ALJ erroneously held that the parents agreement not to hold an IEP team meeting in response to their request for home-hospital made M.R. ineligible for the services despite otherwise qualifying.

3.102   The IDEA allows parents and school districts to agree not to convene an IEP team meeting for the purpose of making changes to the IEP (WAC 392-172A-03110(d)(2)(c).  Parents agreed to this mechanism on several occasions prior to their request for home-hospital such as when the district altered M.R.'s IEP to include his life-threatening allergy and when the district altered M.R.'s IEP for at other times without first convening an IEP team meeting.

3.103   The Parents should not be punished for agreeing to a procedure allowed under the IDEA.

**Cedar Law PLLC**
1001 Fourth Avenue #4400
Seattle, WA 98154
angela@cedarlawpllc.com
Tel 206.607.8277 • Fax 206.237.9101

3.104    Parents met the legal conditions necessary to secure home-hospital services by providing the documentation required under WAC 392-172A-02110.

3.105    Nevertheless, the District failed to provide home-hospital services.

3.106    The failure to provide home-hospital services as required left the Student without access to an education during the time his anxiety and other disabilities required services provided at home.

3.107    As a result of the District's failure to provide home-hospital or even offer an alternative through he IEP process, the District denied the student a FAPE.

3.108    The District ultimately never provided any home-hospital services to M.R. and did not address M.R.'s needs until May 2019, several months after the Parents filed for due process.

3.109    Under RCW 28A.225.020, School Districts have a duty to convene a child's IEP team when a student fails to attend school without justification before the child's fifth unjustified absence and certainly before the child's tenth such absence.  If the District thought M.R.'s Parents' request for home-hospital services was unjustified an IEP team meeting was necessary and the District had a duty to schedule that meeting.  However, the District agreed that an IEP team meeting was unnecessary,  thereby affirmatively stating that the parents' request for home-hospital was justified.

**K.  As Prevailing Parties the Parents are entitled to an award of reasonable**

**attorney fees and costs.**

3.110    Parents are the prevailing party under U.S.C. 1415(i)(3)(B) and are entitled to an award of reasonable attorney fees and costs.

3.111    Parents have accrued and continue to accrue attorney fees and cost in their attempt to secure payment through the filing of the action and in their appeal.

**IV.    FIRST CAUSE OF ACTION**

**A.  Partial Appeal of and Judicial Review of an Administrative Order issued under the**

**IDEA**

**Cedar Law PLLC**
1001 Fourth Avenue #4400
Seattle, WA 98154
angela@cedarlawpllc.com
Tel 206.607.8277 • Fax 206.237.9101

4.1     The factual allegations set forth in the above paragraphs are incorporated by reference.

4.2     The Individuals with Disabilities Education Act (IDEA), 20 U.S.J. §1400, requires that school districts provide students with a free, appropriate, public education including special education and related services.

4.3     Washington State law requires school districts within the state to provide to all eligible students within their boundaries, i.e. every special education student between the age of three and twenty-one, with a free, appropriate, public education. W.A.C. 392-172-030. A school district in the State of Washington has an obligation to provide appropriate educational services to meet the needs of a student who has a disability separate and apart from its obligation to provide a free appropriate public education under federal law.

4.4     The Northshore School District failed to provide a free and appropriate public education to M.R.

4.5     The Northshore School District violated the IDEA, 20 USC 1400 et seq., and the federal regulations promulgated thereunder.

4.6     The Northshore School District violated Chapter 28A.13 RCW and WAC Chapter 392-172A.

## V.     SECOND CAUSE OF ACTION

### A.  Request for reasonable attorney fees and costs under the IDEA

5.1     The factual allegations set forth in the above paragraphs are incorporated by reference.

5.2     As prevailing party the Plaintiffs are entitled to reasonable attorney fees.

## VI.     REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests that this Court:

6.1     Assume jurisdiction of this action, receive the records of the administrative proceedings and hear additional evidence at the request of either party;

**Cedar Law PLLC**
1001 Fourth Avenue #4400
Seattle, WA 98154
angela@cedarlawpllc.com
Tel 206.607.8277 • Fax 206.237.9101

6.2    Enter a declaratory judgment that the Northshore School District has denied M.R. a free appropriate public education under the IDEA and state law, by:

    a.    Failing to appropriately evaluate M.R. in November 2016.

    b.    Failing to provide M.R. with a FAPE from December 11, 2018 and the present by failing to provide an IEP tailored to M.R.'s needs, by failing to provide an IEP that complied with the requirements of WAC 392-172A-03090, and by failing to provide an appropriate behavioral intervention plan.

6.3    Reverse the erroneous findings and conclusions of the administrative court,

6.4    Vacate the remedies set forth in the March 22, 2019 administrative order,

6.5    Order Northshore School District to reimburse the Parents' expenses for private services obtained at Dolan Academy in compensation for their denial of a FAPE to the Student from November 8, 2016 to December 11, 2018 and from December 11, 2018 to the present, as well as the school years through this Court's final decision including reimbursement for transportation to and from those services, and order additional compensatory education necessary to fully compensate M.R. for his denial of FAPE,

6.6    Order an Independent Educational Evaluation for the purpose of determining the amount, type, duration, frequency, provider, and individualized compensatory education program for any additional compensatory education and needed related services, including transportation, necessary to provide M.R. with a FAPE,

6.7    Award Parents their costs and reasonable attorney fees for prevailing in the administrative proceeding, and any additional fees incurred pursuing this appeal and action to enforce their rights to a fee award, pursuant to 20 USC § 1415(i)(3)(B); and

6.8    Any and all other relief as the Court may deem just and equitable.

**Cedar Law PLLC**
1001 Fourth Avenue #4400
Seattle, WA 98154
angela@cedarlawpllc.com
Tel 206.607.8277 • Fax 206.237.9101

Dated this 12th day of June, 2019.

CEDAR LAW PLLC


     /s/ Angela Shapow
Angela Shapow, WSBA No. 41471
Attorney for Plaintiff
Cedar Law PLLC
1001 Fourth Ave., Suite 4400
Seattle, WA, 98154
(206) 607-8277
Fax (206) 237-9101
angela@cedarlawpllc.com

**Cedar Law PLLC**
1001 Fourth Avenue #4400
Seattle, WA 98154
angela@cedarlawpllc.com
Tel 206.607.8277 • Fax 206.237.9101

## DECLARATION OF SERVICE

The undersigned declares under penalty of perjury under the laws of the State of Washington that on this day the undersigned caused to be served in the manner indicated below a copy of the foregoing document directed to the following individuals:

<u>**Counsel for District**</u>:

Carlos Chavez
Pacifica Law Group
1191 2nd Ave., Suite 2000
Seattle, WA 98101

**_____ Via Messenger**
**_____ Via Facsimile – (FAX) NUMBER**
**  X    Via U.S. Mail, postage prepaid**
**_____ Via Overnight Mail, postage prepaid**
**  X    Via email to**
**      carlos.chavez@pacificalawgroup.com**

DATED this 2nd day of July, 2019.

By Kaitlin Young

**Cedar Law PLLC**
1001 Fourth Avenue #4400
Seattle, WA 98154
angela@cedarlawpllc.com
Tel 206.607.8277 • Fax 206.237.9101